UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

LISA BRESLAU,

                Plaintiff,

     v.

JOHN CAMPBELL,

                Defendant.

Case No. 3:23-cv-00459-AR

**OPINION AND ORDER**

_____

**ARMISTEAD, Magistrate Judge**

       Plaintiff Lisa Breslau brings this action against defendant John Campbell, alleging that Campbell breached their contract by failing to pay her $400,000 after he "cheated" on her. The agreement has a provision in which Campbell, if he cheated on her, was required to pay Breslau $400,000 to partially equalize the division of separate property. That provision defines "cheating" to include, among other things, watching pornography and establishing an emotional connection with another woman, and Breslau alleges that he did both.

Page 1  – OPINION AND ORDER

Campbell moves for summary judgment, arguing that the contract is unenforceable because the cheating provision provides for unlawful liquidated damages and is unconscionable. The court disagrees, and therefore DENIES the motion for summary judgment. Campbell also moves for partial summary judgment on the allegation that he watched pornography. On that motion, the court agrees with Campbell and therefore GRANTS the motion for partial summary judgment.[1]

## LEGAL STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," the "mere existence of a scintilla of evidence in support of the [non-moving party]'s position [is] insufficient" to overcome a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks omitted).

---

[1]    The parties have consented to jurisdiction by magistrate judge as permitted by 28 U.S.C. § 636(c)(1). (Full Consent, ECF No. 17.)

Moreover, this court's jurisdiction is based on the diversity of the parties' citizenship—Campbell is a Washington resident and Breslau is an Oregon resident—and both Breslau and Campbell agree that the contract dispute is resolved under Oregon law.[2]  Accordingly, this court interprets and applies the substantive law of Oregon. *See Erie Railroad v. Tompkins*, 304 U.S. 64, 78 (1938). If the Oregon Supreme Court has not directly addressed a question raised by the parties' arguments, the court "must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *Nelson v. City of Irvine*, 143 F.3d 1196, 1206 (9th Cir. 1998).

## BACKGROUND

Breslau and Campbell were in an intimate relationship and lived together in Breslau's Portland home. In April 2015, Breslau came to learn that Campbell had had affairs and a pornography habit. Campbell frequently watched pornography on Perfectgirls.net and would regularly receive emails from that website. In June and July 2015, Campbell began therapy for

---

[2]     At a status conference (ECF No. 19), the court inquired whether the dispute was properly in federal court given that it potentially ran afoul of the exception to diversity jurisdiction for domestic relations, *see Ankenbrandt v. Richards*, 504 U.S. 689, 703 (1992) (emphasizing that the exception is "narrowly defined" and "divests the federal courts of power to issue divorce, alimony, and child custody decrees"), or required *Burford* abstention, *id.* at 703 ("It is not inconceivable, however, that in certain circumstances, abstention principles developed in *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), might be relevant in a case involving elements of the domestic relationship even where the parties do not seek divorce, alimony, or child custody."). Both parties stipulated that the case could and would proceed as a contract dispute that did not involve domestic relations issues or domestic relations policy arguments. In his motion for summary judgment, Campbell included a policy argument supporting unconscionability but, upon being reminded that he agreed that such an argument was off limits, withdrew it. (Order, ECF No. 40 ("Upon stipulation of the parties (by email), defendant withdraws part III.C.2 of his Motion for Summary Judgment.").

his sex and pornography habits, and the emails from Perfectgirls.net ended. (Breslau Decl. ¶¶ 1-2, ECF No. 42.)

Around that time, Breslau also saw a therapist. Her therapist encouraged her to enter into a contract with Campbell for her protection since they were not married. Although Campbell saw a future with Breslau that included marriage and buying a home together, Breslau lacked trust and said that she would not move forward in the relationship without the assurances of contract. (*Id.* ¶ 3.)

In March 2016, Breslau and Campbell hired a family law mediator with the hope to salvage their relationship, equalize economic and other imbalances in the relationship, and provide Breslau with assurances she needed to continue with their relationship. The mediation resulted in a "Domestic Partnership Agreement" (Agreement) for which Breslau and Campbell each had independent legal counsel to advise them. (*Id.*; Agreement, ECF No. 35-1 & ECF No. 42-1.) As relevant to this dispute, Section 5 concerns the parties' property rights upon dissolution. The beginning of Section 5 defined Breslau's and Campbell's rights to their separate property, and specified that, if the relationship survived 12 months without Campbell "cheating" or earlier if by mutual agreement, each party would retain their separate property and split equally any joint property. (Agreement § 5(a)-(c).) However, if

> within twelve (12) months of the date of this Agreement [Campbell] terminates their relationship by giving written notice to [Breslau], filing a petition to dissolve the relationship or otherwise electing to leave or abandon [Breslau, Campbell] shall immediately pay to [Breslau] from his Separate Property the sum of $200,000 to partially equalize the division of assets provided that [Campbell] has not cheated on [Breslau]. If [Campbell] has cheated on [Breslau], then the provisions of section 5.e below shall apply.

Page 4  – OPINION AND ORDER

(*Id.* § 5(d).) The provision of the Agreement critical to this case is Section 5(e), which

provides:

> If [Campbell] does cheat on [Breslau] at any time during the relationship
> and the relationship is thereafter dissolved by either [Campbell or
> Breslau], then [Campbell] shall immediately pay to [Breslau] from his
> Separate Property the sum of $400,000 to partially equalize the division of
> property. This shall not be in addition to the sum of $200,000 as set forth
> in section 5.d above, but shall be instead of the $200,000 payment.

Section 5(e) defines "cheating" as

> any sexual relationship with a woman other than [Breslau], including any type of
> sexual activity with another woman. Cheating shall also include visiting exotic
> dance venues or strip clubs or establishing an emotional relationship or
> connection with a female via phone, e-mail, text, internet or in person. Cheating
> shall also include watching pornography or NC-17 rated movies or media (unless
> [Breslau] is present). [Campbell] may watch G, PG or R rated movies or media
> whether or not [Breslau] is present.

The Agreement (Section 6) also required Campbell to maintain a $1 million life

insurance policy designating Breslau as its beneficiary, and Breslau to arrange a payment of

$25,000 to Campbell if she died. In Section 7, each party disclaimed liability for the debts of the

other. Section 10 includes an acknowledgement that both Breslau and Campbell had received the

advice of independent legal counsel about what the Agreement would require of them and that

they had "complete understanding" of the Agreement's "legal effects." The parties

acknowledged that they might be giving up "substantial legal rights in the property of the other

party" by entering into the Agreement. (*Id.* at 2.) The Agreement is dated November 18, 2016.

(*Id.* at 1.)

On July 20, 2018, the relationship ended and Campbell moved out of the house he shared

with Breslau. (Breslau Decl. ¶ 11.) In July and November 2017, Breslau took screenshots of

Campbell's phone that showed emails from women that she says were like the ones Breslau had

Page 5  – OPINION AND ORDER

seen from Perfectgirls.net before Campbell agreed to stop watching pornography. Until then, Campbell had not received any emails from that website for almost two years. (*Id.* ¶ 10.)

Breslau now brings this lawsuit against Campbell, alleging facts to prove that Campbell watched pornography and established an emotional connection with another woman before she and Campbell ended the relationship. (Campbell does not challenge in his motion for summary judgment that there is a genuine issue of material fact as to the emotional connection allegation.) Breslau claims that Campbell "materially breached his agreement with [Breslau, and Breslau] has done everything required of her under the agreement and [Campbell] has failed to pay [Breslau] the amount owed under the agreement." (Compl. ¶ 12, ECF No. 28.)

## DISCUSSION

### A.    *Unlawful Liquidated Damages*

Oregon courts engage in a two-step inquiry when assessing whether a payment provision in a contract is an unlawful liquidated damages clause. "First, the court determines whether the disputed clause actually is a liquidated damages clause. Second, if the disputed clause is a liquidated damages clause, [the court] must determine whether it is imposed as an unlawful penalty." *Kesterson v. Juhl*, 157 Or. App. 544, 548 (1998) (citing *DiTommaso Realty, Inc. v. Moak Motorcycles, Inc.*, 309 Or. 190, 195 (1990)). There is no need to reach the second question if the first is answered in the negative. *DiTommaso*, 309 Or. at 195.

At the first step, the court considers whether the clause "set[s] the amount of damages to be recovered by one party from another in case of the latter's failure to perform as agreed." *Id.* (quoting *Illingworth v. Bushong*, 297 Or. 675, 681 (1984)). Courts must take care to distinguish a liquidated damages clause "from a clause that merely requires payment when a contract term has

been satisfied." *Kesterson*, 157 Or. App. at 548 (citing *DiTommaso*, 309 Or. at 195-96). The key inquiry is whether the act triggering payment is a breach of another term in the contract: if so, the payment is for liquidated damages. *DiTommaso*, 309 Or. at 197-98.

### 1.    Whether Payment is Triggered by a Breach

In Campbell's view, Section 5(e) of the Agreement is a liquidated damages clause because it sets forth damages that Campbell must pay to Breslau if he breaches the contract by cheating. (Def.'s Mot. at 7.) As previously noted, Section 5(e) provides, in part:

> If [Campbell] does cheat on [Breslau] at any time during the relationship and the relationship is thereafter dissolved by either [Campbell] or [Breslau], then [Campbell] shall immediately pay to [Breslau] from his Separate Property the sum of $400,000 to partially equalize the division of property. This shall not be in addition to the sum of $200,000 as set forth in section 5.d above, but shall be instead of the $200,000 payment.

Breslau responds that the Agreement does not prohibit Campbell from cheating and that, because the payment is not triggered by a breach, it is not a liquidated damages clause. (Pl.'s Resp. at 20-21). Instead, she says she is owed payment under Section 5(e) "because a contract term has been satisfied." (Pl.'s Resp. at 19 (quoting *DiTommaso*, 309 Or. at 196).)

In Breslau's view, interpreting Section 5(e) as a liquidated damages clause would be inconsistent with the Oregon Supreme Court's holding in *DiTommaso*, 309 Or. at 196-97 (1990). (*See* Pl.'s Resp. at 19-22.) *DiTomasso* involved a contract that gave a real estate broker the "exclusive right to sell" a landowner's property. *Id*. at 192 n.1. The contract further provided that, if the owner sold the property without the broker's assistance, the owner would have to pay the broker a fee. *Id.* at 192. The court concluded that the fee provision was not a liquidated damages clause. *Id.* at 196-97.

Despite acknowledging that the owner's independent sale of the property would

ordinarily conflict with the broker's "exclusive right to sell" that property, the court explained

that, by requiring the owner to pay a fee if he sold the property himself, the contract

"recognize[d]" the owner's right to take that action. *Id.* at 197 (distinguishing from earlier case

where the court concluded that an owner's independent sale of land *was* a breach of an

exclusive-right-to-sell contract, noting that the contract in the earlier case "did *not* expressly

provide that if the seller sold the house during the life of the contract, the broker would receive a

fee" (emphasis added)). Because the contract in *DiTommaso* recognized the owner's right to sell

the property himself, the owner did not breach the contract by doing so. Accordingly, the fee

provision was not a liquidated damages clause. *Id.* at 198.

Under *DiTommaso*, where a contract does not explicitly prohibit a party's action, and

instead recognizes the party's right to take that action, the party does not breach the contract by

taking that action. *Id.* at 195-98; *see also Old Navy, LLC v. Ctr. Devs. Oreg., LLC,* Case No.

3:11-472-KI, 2012 WL 2192284, at *10 (D. Or. June 13, 2012) (concluding that "alternate rent

remedy" that was triggered if plaintiff's "operating requirements" were not met was not a

liquidated damages clause because the contract did not impose on defendant any obligation to

ensure that the "operating requirements" were met and it recognized that defendant might take

actions inconsistent with meeting the "operating requirements"); *Pence v. Aspen Educ. Grp.,*

*Inc.*, Case No. 05-6199-HO, 2006 WL 2235192, at *2 (D. Or. Nov. 16, 2006) (concluding that

payment provisions did not "concern liquidated damages" because they were "not triggered by a

breach" where the agreement contemplated the triggering event).

*DiTommaso* is instructive here. The Agreement does not prohibit Campbell from

cheating. Instead, the Agreement recognizes Campbell's right to do so by providing that, if he

cheats and the parties break up "thereafter," he must pay Breslau. Because the action triggering payment is not a breach of the contract, Section 5(e) is not a liquidated damages clause.

### 2.    Whether the Agreement Contains an Implied Promise

In his Reply, Campbell for the first time argues that the Agreement contains an implied promise not to cheat. (Def.'s Reply at 11-12.) A court may decline to address a new argument raised for the first time in reply briefing. *See Tovar v. U.S. Postal Serv.*, 3 F.3d 1271, 1273 n.3 (9th Cir. 1993) ("To the extent that [a reply] presents new information, it is improper."); *Ruiz v. Fernandez*, 949 F. Supp. 2d 1055, 1063 (E.D. Wash. 2013) ("[A] party may not raise new legal issues for the first time in [his] reply brief." (citing *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999))). Even so, the court will address Campbell's implied-promise argument.

Although no term in the contract expressly prohibits Campbell from cheating, he asks the court to read into the Agreement an implied promise not to cheat, relying on the doctrine of necessary implication. (Def.'s Reply at 11 & n.8.) Under that doctrine, "the law will imply a provision in a contract only when it is necessary to carry out the purpose for which the contract was made." *Hynix Semiconductor Mfg. Am. v. Eugene Water & Elec. Bd.*, 276 Or. App. 228, 235 (quotation marks omitted) (citing *Morrow v. Red Shield Ins.*, 212 Or. App. 653, 661 (2007); *Card v. Stirnweis*, 232 Or. 123, 134 (1962)). Necessary implication allows a court to read an unwritten obligation into a contract when "it can be plainly seen from all the provisions of the instrument taken together, that the obligation in question was within the contemplation of the parties when making their contract . . . in other words, it is a necessary implication from the provisions of the instrument." *Morrow*, 212 Or. App. at 661 n.3 (quoting *Pinnacle Packing Co. v. Herbert*, 157 Or. 96, 106 (1937)).

Here, the Agreement's recitals set out its purpose. The parties sought to "define the respective rights that each ha[d] in the property and estate of the other during their partnership and after its termination by death or separation." (Agreement at 1.) They intended the Agreement to "make a complete and final settlement of all their present and future property rights" and to "supercede any rights either party may have under the laws of Oregon or any other jurisdiction which define the rights and duties of people living together without marriage." (*Id.* at 2.) In short, the stated purpose of the Agreement was to define the parties' rights to their joint and separate property. (*See id.* at 1-2.)

The express terms of the Agreement do just that. The Agreement identifies the property that the parties consider to be "joint" and "separate." (*Id.* §§ 1-2.) It describes the parties' rights to that property upon "dissolution" under five scenarios: (1) if the relationship is dissolved by mutual agreement; (2) if the relationship is dissolved by Campbell after 12 months; (3) if the relationship is dissolved by Breslau; (4) if the relationship is dissolved by Campbell within 12 months; and (5) if Campbell cheats and the relationship is thereafter dissolved. (*Id.* § 5(c)-(e).) The Agreement separately sets out the parties' rights to any jointly owned residence in Section 5(f), their rights upon the death of the other in Section 6, and each party disclaims liability for the other's debts in Section 7. The rights and obligations outlined in Sections 5(f), 6, and 7 are unaffected by the occurrence of cheating.

Reading all those provisions together, the court cannot conclude that a promise not to cheat was plainly "within the contemplation of the parties when making their contract." *Morrow,* 212 Or. App. at 661 n.3 (quoting *Pinnacle,* 157 Or. at 106). The Agreement accomplishes its stated purpose without the implied promise. And even under Section 5(e), cheating alone does

not trigger the obligation to pay: only if Campbell cheats "and the relationship is thereafter dissolved" is Campbell required to pay Breslau. That cheating alone does not trigger payment supports the court's conclusion that the contract was aimed at defining the parties' property rights at the end of their relationship, not at preventing Campbell from cheating. Further, as noted in Section A.1., above, the requirement that Campbell pay Breslau if their relationship ended because of his cheating is a recognition of his right to cheat.

Because an implied promise not to cheat is not necessary to carry out the Agreement's purpose, nor can it be "plainly seen" in the terms of the Agreement, the court cannot read that promise into the parties' contract. *Morrow*, 212 Or. App. at 661 ("Although a court may declare what is implicit in the terms of a contract, it may not create an entirely new obligation under the guise of 'necessary implication.'"). The court concludes that Section 5(e) of the contract is not a liquidated damages clause because Campbell's obligation to pay is not triggered by his breach of any obligation—express or implied—under the Agreement. Because that is the case, the court need not proceed to determine whether section 5(e) is an *unlawful* liquidated damages provision.

**B.**     *Unconscionability*

In Oregon, "[u]nconscionability may be procedural or substantive." *Bagley v. Mt. Bachelor, Inc.*, 356 Or. 543, 555 (2014). Procedural unconscionability focuses on how a contract was formed, specifically two factors: oppression, which occurs when the parties have unequal bargaining power to the extent that one party has no real opportunity to negotiate the contract's terms and there is no meaningful choice, and surprise, which involves whether terms were hidden or obscure to the party seeking to avoid them. *Id*. Consideration of the evidence related to the circumstances of the contract's formation inform whether a contract is procedurally

unconscionable. Substantive unconscionability focuses on a contract's terms, and not a contract's

formation, and asks whether the substantive terms violate the public interest or public policy. *Id*.

To assess whether a term violates public policy or the public interest, a court looks to legislation

or to the common law. *Id*. at 556-57. "The fact that the effect of a contract provision may be

harsh as applied to one of the contracting parties does not mean that the agreement is, for that

reason alone, contrary to public policy, particularly where 'the contract in question was freely

entered into between parties in equal bargaining positions and did not involve a contract of

adhesion, such as some retail installment contracts and insurance policies.'" *Id*. at 552 (quoting

*W.J. Seufert Land Co. v. Greenfield*, 262 Or. 83, 92 (1972)).

Here, Campbell's unconscionability argument contends that Section 5(e) is "overly one-

sided" and therefore substantively unconscionable. (Def.'s Mot. at 10.) That is, in Campbell's

view, the provision is substantively unconscionable because Breslau, not Campbell, decides what

constitutes cheating, and "cheating" is too broad a term because it does not define "establishing

an emotional relationship or connection" with any woman other than Breslau. Therefore,

Campbell argues, Breslau has "unfettered discretion" as to whether Campbell violated the

cheating provision. That argument depends on two legal premises: (1) a contract can be

unconscionable based on substantive unconscionability alone—procedural unconscionability is

unnecessary; and (2) a contract can be substantive unconscionable because a term is overly one-

sided. The court disagrees that those two premises are consistent with Oregon law.[3]

---

[3]      Because the court rejects Campbell's legal arguments about unconscionability, it need not
address his contention that Section 5(e) is "overly one-sided."

As to Campbell's first premise—whether a contract is unconscionable without procedural unconscionability—the Oregon Supreme Court left that question open in *Bagley, id*. at 556 n.8, when it noted that some jurisdictions require both procedural and substantive unconscionability but declined to decide that issue upon concluding that both considerations supported the conclusion that the anticipatory negligence release at issue was unconscionable. Campbell points to Oregon Court of Appeals opinions, *Vasquez-Lopez v. Beneficial Oregon, Inc.*, 210 Or. App. 553 (2007), and *Hatkoff v. Portland Adventist Med. Cent.*, 252 Or. App. 210, 218 (2012), to argue that a contract does not require procedural unconscionability if a term is substantively unconscionable. Although that court has indeed said that "[i]t is clear that, if a challenged provision is substantively unconscionable, it is unenforceable—regardless of whether it is procedurally unconscionable," *Hatkoff*, 252 Or. App. at 218,[4] this court is bound by the Oregon Supreme Court's statement in *Bagley* that the issue is an open question. *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940) (observing that "the highest court of the state is the final arbiter of what is state law"). Campbell also cites *Chalk v. T-Mobile USA, Inc.*, 560 F.3d. 1087 (9th Cir. 2009), which relied on *Vasquez-Lopez* and predates *Bagley*, but that case is no longer controlling on this issue. *See United States v. Gonzalez-Zotelo*, 556 F.3d 736, 740-41 (9th Cir. 2009) (explaining that the "district court, like this panel, was bound to follow the reasoning of [prior

---

[4]        Neither *Vasquez-Lopez* nor *Hatkoff* relied solely on substantive unconscionability to determine whether a contract was enforceable. *See Vasquez-Lopez*, 210 Or. App. at 567 ("The circumstances under which the contract in this case was formed strongly suggest unconscionability. Plaintiffs were given a standard form 'take it or leave it' contract drafted by defendant—a classic contract of adhesion."); *Hatkoff*, 252 Or. App. at 223 ("Having determined that the terms of the agreement are not substantively unconscionable, we proceed to plaintiff's argument that the agreement is procedurally unconscionable. That issue, although not 'essential,' is nonetheless 'relevant.'" (quoting *Vasquez-Lopez*, 210 Or. App. at 567)).

circuit authority] unless it had been "effectively overrule[d]" or was "clearly irreconcilable" with a case from the relevant court of last resort"). Campbell is incorrect that Oregon law definitively allows for determining that a contract is unconscionable solely because of substantive unconscionability.

As to Campbell's second premise—whether a term of a contract can be substantively unconscionable if it does not violate the public interest or public policy—he again relies on *Vasquez-Lopez* to argue that a court may determine that a term of a contract is substantively unconscionable if it is "overly one-sided." That is, the Oregon Court of Appeals stated in that opinion that substantive unconscionability "generally refers to the terms of the contract as opposed to the circumstances of formation and 'focuses on the one-sided nature of the substantive terms.'" *Vasquez-Lopez*, 210 Or. App. at 567 (quoting *Acorn v. Household Int'l, Inc.*, 211 F. Supp. 2d 1160 (N.D. Cal. 2002)). Setting aside (for now) that the *Vasquez-Lopez* court relied on a California federal court applying California law to define substantive unconscionability, the Supreme Court in *Bagley* has since said that substantive unconscionability "focuses on whether the substantive terms *contravene the public interest or public policy*." 356 Or. at 556-57 (citing *Restatement* § 208 comment a; *Williston on Contracts* § 18.10 at 91; emphasis added.). A focus on contravening public policy or the public interest is quite different from a focus on the one-sided nature of a contract term.

The court, however, is willing to entertain the possibility that the Oregon Supreme Court was not foreclosing other ways to consider substantive unconscionability given that the issues pitched to it were centered on public policy and the public interest. *Id*. at 554 (the parties disputed whether the anticipatory release was illegal because it was contrary to public policy and

whether its substantive provision contravened public policy and the public interest, and the court explained that it would address both arguments under an unconscionability analysis). With that said, however, the court is incredulous that the Oregon Supreme Court would hold that an overly one-sided contract term is substantively unconscionable when the circumstances of its formation evinced equality of bargaining power without any surprises. Such a holding would go against the bedrock principle of contract law that parties should be held to "the consequences of their bargain." *Id*. at 551 (quoting *Bliss v. Southern Pacific Co.*, 212 Or. 634, 646 (1958) (observing that it "is a truism that a contract validly made between competent parties is not to be set aside lightly" and "When two or more persons competent for that purpose, upon a sufficient consideration, voluntarily agree to do or not to do a particular thing which may be lawfully done or omitted, they should be held to the consequences of their bargain.")).

Returning to *Vasquez-Lopez*, the California formulation of substantive unconscionability coexists with that state's requirement that unconscionability requires *both* procedural and substantive unconscionability. *Bagley*, 356 Or. at 556 n.8 (noting that California courts "require both procedural and substantive unconscionability before they will invalidate a contract" or clause (citing *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal.4th 83, 114 (2000))). This case suggests why, under California law, a term that is one-sided is unconscionable only when there is procedural unconscionability. The Agreement was negotiated with the aid of a mediator, and each party sought the legal advice of their own attorney before signing it— therefore Campbell meaningfully agreed to it and, at the time he entered into it, must have believed Section 5(e) to be reasonable. Concluding that the contract was unconscionable without procedural unconscionability would relieve him of being held to the "consequences of his

bargain." *Bagley*, 356 Or. at 551. Campbell's *private interest*—the term is asserted as harsh—is at stake, and *Bagley* allows for the possibility that a court will not enforce a contract solely on grounds of substantive unconscionability but only if doing so is in the *public interest*. It is highly doubtful that the Oregon Supreme Court would adopt an approach that departs from *Bagley* and from California's requirement that unconscionability requires both substantive and procedural unconscionability.

In sum, there is no reason to conclude that the Supreme Court would adopt both premises advanced by Campbell to determine that an overly one-sided contract does not require procedural unconscionability. Because Campbell's arguments about what is required for a court to conclude that a contract is unconscionable are incorrect, he has not met his burden of demonstrating that Section 5(e) was unconscionable at the time it was made and therefore unenforceable. *See W.L. May Co. v. Philco-Ford Corp.*, 273 Or. 701, 707 (1975) (so stating the burden).

## C.    *Cheating—Watching Pornography*

Breslau alleges that Campbell watched pornography outside her presence, conduct that is considered "cheating" under Section 5(e) of the Agreement. Campbell partially moves for summary judgment on that allegation, arguing that there is no genuine issue of material fact that he watched pornography. In Campbell's view, Breslau's allegation—Campbell watched pornography because he regularly received emails from Perfectgirls.net in 2015, stopped getting them for almost two years, and then the emails started up again in 2017—is speculative. (Def.'s Mot. at 6.) He says that Breslau has no personal knowledge of Perfectgirls.net's email practices and what would trigger sending the kind of emails that he received in 2017. Further, Campbell

contends that, even if the emails were caused by him visiting Perfectgirls.net, it is unreasonable to infer that he "watched" pornography while visiting. For Breslau's part, she contends that receiving emails from Perfectgirls.net as a consequence of having watched pornography on that website and then having those emails start back up again after a period of not getting them allows a reasonable inference that Campbell resumed watching pornography on Perfectgirls.net.

It is, however, inconclusive as to whether the 2017 emails were from Perfectgirls.net. Campbell attaches to her declaration screenshots of the 2017 emails she alleges were from Perfectgirls.net. (ECF No. 42-2.) One email is from "Maria Edwards" and not only does the screenshot of the email not show the sender's email address, it instructs that the recipient can message the sender at her page and includes the URL www.maria-edwards.us. (*Id.* at 1.) Moreover, the screenshot of an email from "Violet Hall" indicates that the sender had seen the recipient's "e-mail address on the Internet." (*Id.* at 3.) There is nothing in the screenshot exhibits that indicate that they were sent by Perfectgirls.net.

Breslau, in her declaration in support of her Response to Campbell's summary judgment motion, states that in 2015 Campbell "would receive emails from Perfectgirls.net on a regular basis" and "ceased getting emails from Perfectgirls.net, until 2017, when the emails started up again," referencing the screenshot exhibits. (Breslau Decl. ¶ 10.) Breslau's declaration, however, does not state what led her to conclude that the 2017 emails were sent from Perfectgirls.net. (*See id.*) Nor is there in the record screenshots of the Perfectgirls.net emails or text messages that were sent to Campbell before 2015 to use as a comparison to the 2017 emails. Moreover, in Breslau's deposition, she testified that one of the things that led her to hire a private investigator

in 2015 was that she would see "text messages" "pop up" on Campbell's phone. (Breslau Dep. at 4, ECF No. 43-1.) Yet the 2017 screenshots were of emails, not texts and not "pop ups."

Breslau's theory that Campbell watched pornography depends on an inference that any emails Campbell received from Perfectgirls.net in 2017 resulted from him visiting that website sometime after November 18, 2016. The court agrees with Campbell that there is much that is unknown about what triggers the kind of emails that Campbell received, in general or specifically from the website Perfectgirls.net, making the determination of whether there is a genuine issue of material of fact on that issue a close call. Indeed, Breslau acknowledged that she did not know whether, in the time between the emails stopping and starting back up again, Campbell deleted spam emails before she saw them. (Breslau Dep. at 13, ECF No. 45-1.) However, even assuming that that inference is reasonable and not speculative, Breslau's allegation rests on the premise that Campbell received emails from Perfectgirls.net in both 2015 and 2017. But Breslau's evidence does not adequately reflect that the 2017 emails were from Perfectgirls.net, suggesting that Breslau's belief that the 2017 emails were from Perfectgirls.net was conjecture on her part and not based on personal knowledge. *See* FED. R. CIV. P. 56(c)(4) (requiring that affidavits or declarations be made on personal knowledge). Consequently, there is insufficient evidence to create a genuine issue of material fact that Campbell watched pornography in 2017.

\ \ \ \ \

\ \ \ \ \

\ \ \ \ \

\ \ \ \ \

**CONCLUSION**

For the above reasons, defendant's motion for summary judgment is DENIED and defendant's alternative motion for partial summary judgment is GRANTED. Accordingly, ECF No. 34 is DENIED IN PART and GRANTED IN PART.

DATED: February 16, 2024

_____
JEFF ARMISTEAD
United States Magistrate Judge